## A04A1386. LAMAD MINISTRIES, INC. v. DOUGHERTY COUNTY BOARD OF TAX ASSESSORS.

(602 SE2d 845)

ELDRIDGE, Judge.

On January 20, 2004, after a bench trial the Dougherty County Superior Court affirmed the multi-year appeal of Lamad Ministries, Inc. from the Board of Equalization of Dougherty County's decision, finding no tax exemption for it either as a "place[ ] of religious worship," OCGA § 48-5-41 (a) (2.1) (A) or (B), or exempt, as a home for the aged under OCGA § 48-5-41 (a) (12). The trial court found that it is not a place of religious worship or a property owned by and operated exclusively as a church, an association or convention of churches, a convention mission agency, or as an integrated auxiliary of a church or convention or association of churches. Further, the trial court found it does not operate as a religious institution. The trial court also found that it provided a residence to persons over the age of 55 but was not as a "nonprofit home for the aged," OCGA § 48-5-41 (a) (12) (A), because Lamad Ministries did not operate the home for the aged as a separate tax exempt corporation. Finding errors of law and of factual findings that were clearly erroneous, we affirm in part and reverse in part.

The only evidence in the record was submitted by Lamad Ministries; therefore, there was no conflict in the evidence. The trial court's findings of fact omitted much of the evidence that Lamad Ministries considered essential and is included here for amplification only. In deciding this case, the facts as found by the trial court are relied upon, and the law is applied to the facts thus found.

It is undisputed that Lamad Ministries, as a church, is a member of the Mallary Baptist Association, the Georgia Baptist Convention, and the Southern Baptist Convention. There are no stockholders or ownership interest in this nonprofit tax exempt corporation, and there is no affiliated or brother-sister corporation. The trial court found that Lamad Ministries religious charitable operations include: (1) a broadcast ministry; (2) a church; (3) a Christian counseling center; and (4) a nonprofit Christian home for the aged.

The central issue is the taxability of Lamad Ministries' home for the aged, which it operates as the Seasons Christian Care Center ("SCCC"). The trial court found that "the statute . . . calls for non-profit homes for the aged to be separate entities, in order that the tax exemption can be clearly granted to the home." The trial court found that SCCC is comprised of 21 acres, and there are 170 residents in 135 residential units made up of 43 two- and three-person villas

and apartments.[1] Residents cannot be younger than 55, and the average age of residents is 77.7 years.

According to Lamad Ministries, an applicant must provide evidence that he is over 55 years of age, capable of living independently, and possess a genuine belief that it is God's will for him or her to reside there. There is no denominational or theological litmus test for prospective residents; in fact, accommodation can be made for atheists or agnostics. After the application, and reservation fees, the resident selects the floor plan and pays a one-time "ministry deposit" that can be afforded by the prospective resident. The balance of the ministry deposit is funded by Lamad Ministries. Such ministry deposit defrays the cost of construction, of refurbishing the living units, and to refund former residents or their designated heirs between 85 and 100 percent of the initial ministry deposit paid. The initial ministry deposit is refunded at a reduction of three percent per year for the first five years and thereafter eighty-five percent is refunded. Depending upon the level of care, i.e., Basic Watchcare, Supervised Watchcare, and Private Home Care, each resident pays a "resident service expense" to defray their living expenses and care costs. If at any time the resident is no longer able to pay the monthly fee, then the fee is waived and the resident continues to occupy his unit.

Lamad Ministries contends that the entire campus of this home for the aged constitutes "a place of worship, prayer, nurture, and care" and is used exclusively for religious, charitable, and educational purposes. The undisputed evidence is that there is a ministry center, including the church offices; the Worship and Fellowship Center where worship services are held; the Gideon Memorial Worship and Prayer Station, where individuals can pray; the Shepard Memorial Meditation Garden in the form of a cross with prayer stations; the Villa Tree Park Worship and Assembly Area and Gazebo; and the outdoor Worship and Confession altar for Catholic residents. The president and CEO of Lamad Ministries is the Reverend Bill Eidernire, an ordained minister, who provides for the religious needs of the residents. Reverend Joe Holden is the associate pastor who conducts the prayer ministry. The worship center office and chapel houses are comprised of: the chapel, kitchen, offices, beauty shop, and exercise room.

Erroneously as a matter of law, the trial court found "[t]his case does not present the question of whether the corporation known as 'Lamad Ministries, Inc.' is exempt from income tax, but rather, whether the real property (that is, the tax parcels named above)

---

[1] Lamad's evidence shows that there are 167 living units for 145 residents.

which contains the Seasons Christian Care Center is exempt from ad valorem property tax." However, OCGA § 48-5-41 (a) (12) requires such determination. On May 11, 1987, Lamad Ministries filed Form 1023 "Application for Recognition of Exemption Under Section 501 (c) (3)" with the Internal Revenue Service ("IRS"). Such application for federal tax exemption under 26 USC § 501 (c) (3) covered "church related and church supporting Christian ministry designed to promote charitable missionary, evangelistic, biblical instruction, nurture and care activities with a context of worship and prayer." Specifically, the tax exemption covered a church, Christian counseling center, a radio broadcast ministry, and a senior adult Christian care residence ministry. On October 28, 1987, the IRS requested that Lamad Ministries provide additional information regarding its "counseling activities," "plan to operate a Christian care facilities," and church; the IRS required that Lamad Ministries address in detail the 14 criteria of the agency for the classification as a "church." On November 15, 1987, Lamad Ministries provided the IRS an 11-page, single-spaced letter, providing the details of the scope and breadth of its planned ministry. On March 17, 1988, the IRS issued to Lamad Ministries a determination letter stating "[b]ased on the information you supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined that you are exempt from federal income tax under section 501 (c) (3)." On October 9, 2001, the Georgia Department of Revenue gave a determination letter that under OCGA § 48-7-25, Lamad Ministries was tax exempt.

The trial court found that Lamad Ministries operates its home for the aged as SCCC and that SCCC does not have a 26 USC § 501 (c) (3) federal tax exemption as a separate corporation from Lamad Ministries.

1. Lamad Ministries contends that the trial court erred in not requiring the Dougherty County Board of Tax Assessors to prove by a preponderance of the evidence its assessment on the SCCC property under OCGA § 48-5-311 (g) (3). We do not agree.

The general appeal procedure under OCGA § 48-5-311 (g) (3) covers all appeals. Thus, as general legislation, such Code section must be read in pari materia with OCGA § 48-5-41; such specific legislation must be given effect, since it was neither repealed nor modified when OCGA § 48-5-311 (g) (3) was passed. *Ryan v. Commrs. of Chatham County*, 203 Ga. 730, 732 (1) (48 SE2d 86) (1948); *Allison v. Domain*, 158 Ga. App. 542, 544 (281 SE2d 299) (1981); *Undercofler v. L. C. Robinson & Sons, Inc.*, 111 Ga. App. 411, 414-415 (1) (141 SE2d 847) (1965), aff'd, *L. C. Robinson & Sons, Inc. v. Undercofler*, 221 Ga. 391 (144 SE2d 755) (1965); see also *Monticello, Ltd. v. City of Atlanta*, 231 Ga. App. 382, 383 (1) (499 SE2d 157) (1998) (physical precedent

only). Generally, in statutory construction, a specific statute prevails over a more general statute when they are in conflict, absent any indication of a contrary legislative intent. *Ga. Mental Health Institute v. Brady*, 263 Ga. 591, 592 (2) (436 SE2d 219) (1993); *First Nat. Bank of Atlanta v. Sinkler*, 170 Ga. App. 668, 670 (1) (317 SE2d 897) (1984); see also *Monticello, Ltd. v. City of Atlanta*, supra at 384. "The construction which will give effect to a statute or rule is preferred to a construction which will destroy it." (Citations omitted.) *Brown v. State Merit System of Personnel Admin. &c.*, 245 Ga. 239, 242 (1) (d) (264 SE2d 186) (1980). Newer statutes are construed in connection and in harmony with existing laws, because "[a]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it; they are to be construed in connection and in harmony with the existing law." (Citation and punctuation omitted.) *State of Ga. v. Davis*, 246 Ga. 761-762 (1) (272 SE2d 721) (1980); *McPherson v. City of Dawson*, 221 Ga. 861, 862 (148 SE2d 298) (1966).

Under OCGA § 48-5-41, anyone seeking exemption must carry the burden of proof to show entitlement, and the exemption statute is strictly construed against the person claiming the exemption. *Fulton County Bd. of Tax Assessors v. Visiting Nurse Health System of Metro. Atlanta*, 243 Ga. App. 64, 67 (2) (532 SE2d 416) (2000); see also decided under former law, *Leggett v. Macon Baptist Assn.*, 232 Ga. 27 (205 SE2d 197) (1974); *Gold Kist v. Jones*, 231 Ga. 881, 885 (204 SE2d 584) (1974). Other than such burden to prove the exemption, the Board of Tax Assessors has the burden of proof by a preponderance of evidence that its assessment is correct. OCGA § 48-5-311 (g) (3).

2. Lamad Ministries contends that the trial court erred as a matter of law in holding that it is not entitled to the "home for the aged" exemption under OCGA § 48-5-41 (a) (12) (A). We agree.

The trial court erred as a matter of law in construing OCGA § 48-5-41 (a) (12) as requiring that a home for the aged must be a separate tax exempt corporation from the tax exempt organization that operates both a home for the aged and other tax exempt operations such as a church, a radio ministry, and as a counseling center. The subsection sets only five qualifications for tax exemption: (1) that the home for the aged be a nonprofit corporation; (2) that the corporate entity have no stockholders; (3) that no income or profits be distributed to or for the benefit of any private person; (4) that the nonprofit corporation have IRS tax exemption; and (5) that the nonprofit corporation be subject to Georgia law regulating nonprofit and charitable corporations. There is no condition that the nonprofit tax exempt Georgia corporation only engage in the operation of a

home for the elderly in order to be exempt from ad valorem taxes. All of these conditions have been met and satisfied as a matter of law by Lamad Ministries.

Nowhere in the language of the Act does the statute prohibit a nonprofit corporation, that operates a home for the aged, from engaging in other tax exempt activities or mandate that the building and operation of the home for the aged be its exclusive activity. See generally *McPherson v. City of Dawson,* supra at 862 (" 'All statutes are presumed to be enacted . . . with full knowledge of the existing condition of the law and with reference to it; [laws] are . . . to be construed in connection and in harmony with the existing law.' ").

The clear and unambiguous purpose of the exemption was to encourage the building and operation of homes for the aged by offering ad valorem tax exemption to nongovernmental tax exempt nonprofit Georgia corporations, because there is a growing aging population and a need for housing for them; therefore, the scheme and purpose of the Act was to encourage, and not to discourage, the creation of homes for the aged. The trial court's construction would discourage and undermine the purpose for the Act, because such construction would bar ad valorem tax exemption to numerous tax exempt nonprofit Georgia corporations engaged in other ad valorem tax exempt activities. See generally *Pennington & Evans v. Douglas, Augusta & Gulf R. Co.,* 3 Ga. App. 665, 678 (3) (60 SE 485) (1908) (general scheme and purport of the proposed legislation). The trial court's construction would limit, hinder, and deter such function of building and operating homes for the aged by religious, charitable, fraternal, or veteran organizations that engage in a wide range of other tax exempt activities. "It is the duty of the court to consider the results and consequences of any proposed construction and not [to] so construe a statute as will result in unreasonable or absurd conse-quences not contemplated by the legislature." (Citations, punctua-tion and emphasis omitted.) *Gen. Elec. Credit Corp. &c. v. Brooks,* 242 Ga. 109, 112 (249 SE2d 596) (1978). "In the construction of [any] statute a court may decline to give a legislative act such construction as will attribute to the General Assembly an intention to pass an act which is not reasonable, or as will defeat the purpose of the proposed legislation." (Citation and punctuation omitted.) *Bd. of Trustees of the Policemen's Pension Fund v. Christy,* 246 Ga. 553, 554 (1) (272 SE2d 288) (1980). In construing statutes, interpretations which cause an unreasonable intent to be found, an intent to do an unreasonable thing, or intent to do futile and useless things, will not be found to be the legislative intent; instead, the construction of intent should further the purpose of the Act. *Trust Co. Bank v. Ga. Superior Court Clerks' Coop. Auth.,* 265 Ga. 390 (456 SE2d 571) (1995); *City of Jesup v. Bennett,* 226 Ga. 606, 609 (176 SE2d 81) (1970).

The caption to an Act states the purpose of such legislation as intended by the General Assembly.

> In construing legislation, nothing is more pertinent, towards ascertaining the true intention of the legislative mind in the passage of the enactment, than the legislature's own interpretation of the scope and purpose of the act, as contained in the caption. The caption of an act of the legislature is properly an index to the contents of the statute as construed by the legislature itself, — a summarizing of the act, made right at the time when the discussion of every phase of the question is fresh in the legislative mind.

(Citations and punctuation omitted.) *Copher v. Mackey*, 220 Ga. App. 43, 45 (4) (467 SE2d 362) (1996).

In Ga. L. 1977, p. 1152, the first exemption for homes for the elderly was passed by the General Assembly, and the caption used language expressing its intent almost identical to OCGA § 48-5-41 (a) (12) (A). The caption to the first Act reads: "qualified as exempt organizations under the United States Internal Revenue Code of 1954, section 501 (c) (3), as amended, and section 92-3105 [(OCGA § 48-5-41 (a) (12) (A))], as amended, of the Georgia Code of 1933." Significantly, the caption went on to express the intent of the General Assembly that the Act was "to provide that the exemption herein granted is cumulative and not in derogation of relief granted by other laws." Such language plainly indicated that the General Assembly expected that a nonprofit tax exempt corporation would already be engaged in other tax exempt activities and could be exempt under multiple provisions. Thus, such new exemption was not restricted to a tax exempt corporation only engaged in operating a home for the aged. The General Assembly expressed its clear and unambiguous intent that nonprofit Georgia corporations operating other ad valorem tax exempt activities would be permitted to operate a tax exempt home for the aged without any risk of losing such other ad valorem tax exemptions. Therefore, a Georgia nonprofit tax exempt corporation may receive tax exemption from ad valorem taxes when it operates a home for the aged exclusively or when it operates a home for the aged as well as other tax exempt activities.

Further, when 26 USC § 501 (c) (3) of the IRS Code is specifically adopted and incorporated by reference by Georgia statute, the federal regulations that interpret such statute are also incorporated into such Georgia statute. See *Greene County v. North Shore Resort at Lake Oconee*, 238 Ga. App. 236, 244 (3) (517 SE2d 553) (1999) (physical precedent only). Under 26 CFR § 1.501 (c) (3)-1 (a) (1), the IRS Regulations explicitly provide that an exempt organization

under 26 USC § 501 (c) (3) may be "operated exclusively for one or more of the purposes specified in such section." Therefore, when the General Assembly incorporated 26 USC § 501 (c) (3) into OCGA § 48-5-41 (a) (12), the General Assembly's intent was to include nonprofit tax exempt corporations that were engaged in the operation of more than homes for the elderly, because such exemption was passed with full knowledge of the existing federal tax exemption law and the IRS Regulations. *McPherson v. City of Dawson,* supra at 862.

3. Lamad Ministries contends that the trial court erred as a matter of law in holding that it is not entitled to the "place[ ] of religious worship" and "property owned . . . and operated exclusively [by] a church" exemptions provided by OCGA § 48-5-41 (a) (2.1) (A) and (B) for SCCC property. We agree.

Division 2 controls as to the tax exemption as to all of the SCCC property used primarily as a home for the elderly. However, this and all other properties seeking exemption shall be approached by a primary use analysis, which requires the property to be examined in its separate divisible and primary use parts. In fact, on the first and fourth pages of the judgment, the property was returned in two separate parcels, which received different treatment from the Dougherty County Board of Equalization and which the parties agreed to treat in the same way. In *Thomas v. Northeast Ga. Council, Inc., Boy Scouts of America,* 241 Ga. 291 (244 SE2d 842) (1978), it was held that of a tract of land, one portion should be exempt from ad valorem tax, while the remainder by primary use would not be exempt; it logically follows that one portion of land may be exempt from ad valorem taxes by one primary use, while the remainder by primary use is exempt from ad valorem taxes for a different exemption.

Thus Division 3 applies to the rest and remainder of the property devoted primarily to religious purposes, i.e., the Chapel; Shepard Memorial Meditation Garden; Villa Tree Park Worship and Assembly Area and Gazebo; Worship and Prayer Trail; and Gideon Memorial Worship and Prayer Station. The other property was used primarily as a home for the aged as found in Division 2 and as found by the trial court and therefore, is exempt already.

"[I]t is the rule that all grants of exemption [from taxation] must be strictly construed in favor of the State, and that nothing passes by implication; but this rule must not be pushed to unreasonableness." (Citations and punctuation omitted.) *Rayle Elec. Membership Corp. v. Cook,* 195 Ga. 734-735 (2) (25 SE2d 574) (1943); see also *Roberts v. Atlanta Baptist Assn.,* 240 Ga. 503, 507 (241 SE2d 224) (1978); *Church of God &c. v. City of Dalton,* 213 Ga. 76, 78 (97 SE2d 132) (1957).

The trial court found that Lamad Ministries was not entitled under OCGA § 48-5-41 (a) (2.1) (A) to exemption, because: "[SCCC]

residents have no restrictions on their religious faith, and no restrictions or obligations regarding their activities"; (2) "the original Resident handbook . . . has absolutely no mention of any religious or spiritual element" and a subsequent edition only had "one small paragraph on 'spiritual development'"; (3) "participation in [spiritual] activities is voluntary"; (4) the chapel at the SCCC is small (with only 25 members according to the trial court and 70/75 according to Lamad Ministries), and most residents attend church elsewhere or not at all; and (5) other than three weekly church services (Wednesday, Saturday, and Sunday), "there are no organized religious activities at the facility."

" '(A)ny judicial analysis of a religion is a sensitive and perilous undertaking where it is addressed to the relationship of Church and State. For this reason, courts are loath to inquire into the merits or truth of any set of purportedly religious beliefs.' " (Citation omitted.) *Roberts v. Ravenwood Church of Wicca*, 249 Ga. 348, 350 (3) (292 SE2d 657) (1982). Here, the trial court described the modern nondenominational Protestant church and some main-line denominations as well.[2] The trial court went on to find:

> There was much testimony to demonstrate that Lamad . . . is an organization which feels it is its mission or calling to own a senior living facility, and provide a good place to live to seniors. Yet, having such a calling does not make the property a "place of religious worship"; nor are the owner's feelings and beliefs relevant factors in determining tax exemption. The primary use of the property is as a senior living facility, and it is not primarily a place of religious worship.

Thus, under the findings of fact made by the trial court, the primary use of the property was "as a senior living facility," which in Division 2 was held to be tax exempt. The trial court should have made a separate determination of exemption as to those portions of the property used primarily for a home for the elderly from those parts of the parcels of property primarily used as a place of religious worship. Therefore, the use of other parts of the property primarily for religious purposes would be a place of religious worship, because the trial court found that SCCC was primarily used as a home for the aged as to all the property, which we have found to be exempt; even though the trial court erred as a matter of law in applying the law to

---

[2] *Roberts v. Atlanta Baptist Assn.*, supra at 505-506, in finding tax exemption for land found that "[t]he attenders are generally youth groups of grammar school, high school and college age, of various denominations, including Catholic, under the direction of ministers and Christian lay workers of the various religious groups."

the facts as to the home for the aged, its erroneous application of the law to the facts found as to the property primarily used for a home for the aged also applied to that portion of the property used primarily for worship. Such aggregation of all the property together to determine the primary purpose for exemption deprived that portion of the property used primarily as a place of worship from tax exemption.[3] The trial court treated all of parcels one and two the same and made no specific finding as to the Chapel, Gardens, Gazebo, undeveloped land, and other areas. In fact, there was no evidence in the record showing that the Chapel, Gardens, Gazebo, undeveloped land, and other areas were used for purposes other than as a place of religious worship. *Roberts v. Atlanta Baptist Assn.*, supra at 505. Thus, the trial court's finding as to these parts of the property to be a home for the elderly was without any evidentiary support and clearly erroneous.

The Tax Assessors are fully capable of separating the tax exempt property from nonexempt property and assessing for tax purposes each property appropriately where required. Thus, in looking to the primary use of this part of the property, it comes within a place of religious worship.

> [A] place of [religious] worship is not necessarily a church, nor is the term synonymous with a church; and, in the connection in which the words are used . . . they mean the gathering of individuals for public worship, at whatever place they may be, whether in the open air, under a tent, beneath an arbor, in a warehouse, and . . . in an opera-house. . . . If the presence of the omnipotent and omnipresent God cannot be restricted to a mere man made edifice, surely it was not intended to limit the worship of such a God to a building. Neither is the fact that fewer members than a complete, separate, organized church met in this assembly, controlling.

(Citation, punctuation and emphasis omitted.) *Roberts v. Atlanta Baptist Assn.*, supra at 508-509. The tax exemption as "a place of religious worship" depends upon the primary purpose for which the property is used. *Roberts v. Ravenwood Church of Wicca*, supra at

---

[3] Mixed questions of law and fact are governed by the clearly erroneous standard as to the findings of fact only; however, "the clearly erroneous standard applies solely to the trial court's factual findings and that we owe no deference to the trial court's legal conclusions." *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000). "Under this standard of review, we must defer to the trial court's factual findings unless clearly erroneous, but are not bound by its legal conclusions." (Footnote omitted.) *Garden Club of Ga. v. Shackelford*, 274 Ga. 653, 655 (1) (560 SE2d 522) (2002). "[A]ppellate court must independently apply the legal principles to the facts." (Citation omitted.) Id. at 655, n. 7.

351. Further, "the words 'religious worship' import a concept of a congregation assembling in a place open to the public to honor the Deity through reverence and homage." *Legett v. Macon Baptist Assn.*, supra at 30 (II).

The trial court found that the chapel and other areas were regularly used for worship at various times during the week and were open to public worship. The trial court found that the residents were free to worship there, not to worship at all, or to go elsewhere to worship, which erroneously was given as one basis for finding no primary place of religious worship. Clearly, three religious services were held in the chapel each week on Wednesday, Saturday, and Sunday and at least twenty-five residents attended, and "[t]he essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." (Citation and punctuation omitted.) *Roberts v. Ravenwood Church of Wicca*, supra at 350 (3). It is not the number of worshipers or the frequency of worship, but the primary use that defines a place of worship. A place of worship is no less a place of worship, because it allows all to freely worship as they believe or choose and does not impose a dogma or ritual. Id.

While Lamad Ministries is Baptist by affiliation, it does not exclude other denominations from worship and is ecumenical in approach, welcoming all to worship.

When "the evidence establishes without dispute that religious activities are an integral part of every aspect of the use of the property . . . the property [is] exempt from taxation as a place of . . . worship." *Pickens County Bd. of Tax Assessors v. Atlanta Baptist Assn.*, 191 Ga. App. 260, 261 (381 SE2d 419) (1989).

> [I]n applying the exemption authorized by basic Georgia law to the facts in the individual case, we must look to the use of the property, not merely its ownership, and we must also look to the primary use of the property to determine whether it is exempt from taxation. In addition, we are mindful, in applying these principles, that all tax exemptions are to be strictly construed since taxation is the rule and exemption is the exception.

(Citation omitted.) *Leggett v. Macon Baptist Assn.*, supra at 28 (I).

As to those portions of SCCC not used primarily as a home for the elderly and shown to have been used primarily as a place of worship, the trial court erred as a matter of law in denying tax exemption.

4. Lamad Ministries contends that the trial court erred as a matter of law in holding OCGA § 48-5-41 (d) precludes it from qualifying for the statutory exemptions noted therein. We agree.

The trial court erred as a matter of law in finding that Lamad Ministries acting as SCCC was not exempt as a home for the aged under OCGA § 48-5-41 as found in Division 2 and as a place of religious worship under OCGA § 48-5-41 as found in Division 3; therefore, the trial court's legal conclusion that Lamad Ministries does not come under OCGA § 48-5-41 (d) also is legal error.

5. Lamad Ministries contends that the trial court erred as a matter of law in holding that the denial of tax exempt status did not violate its rights under the Free Exercise and Equal Protection Clauses of the federal constitution.

Having decided Divisions 2, 3, and 4 in favor of Lamad Ministries' ad valorem tax exempt status under OCGA § 48-5-41 on state legal grounds, there is no need to address the federal constitutional issues.

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Adams, J., concur.*

DECIDED JULY 29, 2004.

*James, Bates, Pope & Spivey, Thomas C. James III, Stephen L. Dillard,* for appellant.

*Jenkins & Olson, Peter R. Olson, Brandon L. Bowen, Long & Denton, Vann K. Parrott, William S. Lee IV,* for appellee.